**Joan Cherie AMADEO, Plaintiff–Appellant,**

v.

**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, Defendant–Appellee.**

**No. 00–55333.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 18, 2001.

Filed May 22, 2002.

---

Stanley K. Jacobs and Thomas F. Borcher, Jacobs, Jacobs & Rosenberg, Los Angeles, CA; for the plaintiff-appellant.

Margaret Levy and Becky J. Belke, Manatt, Phelps & Phillips, LLP, Los Angeles, CA, for the defendant-appellee.

Before: BROWNING, FERNANDEZ and FISHER, Circuit Judges.

FISHER, Circuit Judge.

Joan Amadeo filed this suit after Principal Mutual Life Insurance Company ("Principal") denied her benefits under her disability income insurance policy. Principal based its denial on its contention that Amadeo's "regular occupation . . . just prior to her disability" was "unemployed," despite Amadeo's 20 year career in the securities industry before she became unemployed during a period of severe depression. The district court granted partial summary adjudication against Amadeo on her claim that Principal breached the implied covenant of good faith and fair dealing ("bad faith claim") because it found that Principal's denial of benefits was reasonable as a matter of law.

First, as a matter of our jurisdiction, we hold that Amadeo's voluntary dismissal of her breach of contract claim does not preclude her from pursuing her appeal of the district court's ruling on the bad faith claim. Second, we reverse the district court's grant of summary judgment on the bad faith claim. Amadeo presented sufficient evidence from which a jury could conclude that Principal's denial of benefits to Amadeo was based on a bad faith interpretation of its policy and an inadequate investigation into the basis of Amadeo's claim.

## I. BACKGROUND

Amadeo began working in the securities industry in the mid 1970s, rising to the position of a securities compliance officer in 1986. In 1987 she purchased a disability income insurance policy from Principal ("the policy"). Amadeo continued to be employed in the field of securities compliance for the next seven years, including as vice president of compliance for Liberty Securities Corporation between 1991 and 1993 and as vice president for compliance at Griffin Securities Corporation in 1994.

In 1992 or 1993, Amadeo began treatment with a therapist, Dr. Cassel, for depression. Dr. Cassel attributed Amadeo's condition to the jailing of her grandson Vinny, who had been in Amadeo's custody since being removed by court order from her daughter who abused drugs. Amadeo's condition worsened in 1994, when Vinny was charged with first degree murder for killing a prison guard. That year, Amadeo told Griffin Securities about the charges against Vinny and the president allegedly told her that "we don't need people like you around," after which Amadeo left her job.

Amadeo continued to consult with Dr. Cassel through March 1995, when Cassel recommended that, due to the increasing severity of Amadeo's depression, she see a psychiatrist for a medical·consultation. In January 1996, Amadeo began treatment with Dr. Lovelace, a psychiatrist, and Dr. Klemp, a therapist. Dr. Lovelace recorded that Amadeo was suffering from symptoms including "sadness, insomnia, lethargy, panic attacks, headaches, poor concentration,[and] flashbacks" that "first appeared in a milder form in 1991." He diagnosed her as suffering from severe Post Traumatic Stress Disorder (PTSD) and depression. In his recommended treatment plan, he stated that "work is not appropriate" but noted that Amadeo was experiencing a delusion that she was able to work.

Dr. Klemp's notes reflect that Amadeo began a job training program in 1996 but was "unable to stay" because of "headaches, nausea and episodes of unexpected, 'irrational' crying." In part as a result of Dr. Klemp's interventions in therapy, Amadeo admitted to herself that she could not return to employment in the securities industry and applied for disability benefits under her insurance policy and through the Social Security Administration in June 1996. The Social Security Administration granted Amadeo disability benefits dating back to January 1996.

Amadeo's disability income insurance policy provided that a monthly premium would be paid to Amadeo if, "[s]olely due to Injury or Sickness, you are unable to perform the substantial and material duties of your regular occupation in which you were engaged just prior to the disability." Dr. Gallagher, Principal's reviewing psychiatrist, examined Amadeo's application, including the records of her treatment, several times. In his first memorandum to Principal's claims adjusters, he reported that "it appears [Amadeo] has a past history of depression or panic attacks some years ago, approximately 1990 or 1991." He indicated that "[t]here are a great number of stressors at this time, the most obvious of which is her grandson being charged with attempted murder." He also noted that Amadeo was subjected to physical abuse by her husband for many years, "thus, the origin of the diagnosis of PTSD," and was "apparently being stalked by the son of the man that [Vinny] is accused of murdering." Finally, he stated that the symptoms listed by Dr. Lovelace "would suggest that this patient was not able to work at the time."

After more complete records were received, Dr. Gallagher reviewed Amadeo's application a second time. Apparently at the instruction of one of Principal's claims adjusters, he conducted this review solely on the assumption that her "regular occupation" under the policy was "an unemployed person." He concluded that, "reviewing the file more fully and from the vantage point of an unemployed person, it would seem that, although distressed, she was capable of carrying on her activities of daily living" and therefore "was not evidently disabled from her occupation as an unemployed person." Principal thereupon denied Amadeo's claim for payment of benefits because "we must consider your [regular] occupation as that of an unemployed person" and "you have been able to continue many of your daily activities as an unemployed person."

Dr. Gallagher reviewed the file again when Amadeo appealed Principal's initial decision. At that time, Amadeo submitted additional evaluations from Drs. Lovelace and Klemp and the Social Security Administration's grant of disability benefits. Dr. Gallagher recorded that "[i]t is clearly stated in [Dr. Klemp's letter] that this woman is incapable of working which, given the symptoms and [Global Assessment of Functioning of 35], seems to be so. However, I don't know that this information changes our original opinion about her disability status as an unemployed person." On June 25, 1997, Principal rejected Amadeo's appeal based on its continued position that she was not too disabled to perform the substantial duties of her regular occupation of unemployment.

■ Amadeo filed this action against Principal in California state court for tortious bad faith and breach of contract. Principal removed the action to federal court on the basis of diversity jurisdiction and filed a motion for partial summary adjudication of Amadeo's bad faith claim and prayer for punitive damages. The district court granted Principal's motion, finding as a matter of law that Principal's denial of disability benefits to Amadeo was

not unreasonable. The parties then stipulated to a dismissal with prejudice of the remaining breach of contract claim in order to pursue this appeal.[1]

## II. JURISDICTION

Principal argues that we lack jurisdiction to hear this appeal because the voluntary dismissal of Amadeo's breach of contract claim had the effect of barring her bad faith claim. We disagree.

 "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. This principle is applicable to policies of insurance." *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198, 200 (1958) (citation omitted); *accord Kransco v. Am. Empire Surplus Lines Ins. Co.,* 23 Cal.4th 390, 97 Cal.Rptr.2d 151, 2 P.3d 1, 8 (2000); *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 145(1979). The responsibility of the insurer to act in good faith "is not the requirement mandated by the terms of the policy itself" but is imposed by law, breach of which sounds in tort notwithstanding that the denial of benefits may also constitute breach of the contract. *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1037 (1973). Thus, when an insurer acts in bad faith to withhold benefits due under the policy, "the plaintiff will ordinarily have freedom of election between an action of tort and one of contract." *Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173, 178 (1967) (quoting *Comunale,* 328 P.2d at 203); *see also* 1 Witkin, Summary of Cal. Law § 749 (9th ed. 1987) ("The plaintiff may elect to sue either in contract or in tort, to gain whatever substantive or procedural advantages the election may give.").

Amadeo initially brought this action alleging both breach of contract and tortious bad faith. Principal argues that because the parties agreed to dismiss Amadeo's breach of contract claim "with prejudice" under Rule 41(a)(1), we must proceed as if a finding was rendered that Amadeo's insurance contract did not require the payment of disability benefits to her, and therefore Principal's denial of benefits could not have been in bad faith. This argument has no merit.

 Principal is correct that the "precise nature and extent of the duty imposed by [the] implied promise will depend on the contractual purposes," *Egan,* 169 Cal. Rptr. 691, 620 P.2d at 145, and therefore if there is "no potential for coverage" under the policy, a claim for bad faith cannot be brought. *Waller v. Truck Ins. Exch.,* 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619, 639 (1995); *see id.* at 630(explaining that the "complaint, liberally construed, did not assert a risk potentially covered under [the] policy"); *Schwartz v. State Farm Fire and Cas. Co.,* 88 Cal.App.4th 1329, 106 Cal.Rptr.2d 523, 531–32 (2001) (discussing cases). Principal is not correct, however, that we must consider the voluntary dismissal of Amadeo's breach of contract claim as the equivalent of a binding determination that there was no potential for coverage of Amadeo's claim under the policy.

---

1. When a party who has suffered an adverse partial judgment subsequently dismisses remaining claims, the judgment entered is final for purposes of appeal under 28 U.S.C. § 1291. *See Concha v. London,* 62 F.3d 1493, 1507–09 (9th Cir.1995) (allowing appeal of partial summary judgment after plaintiff dismissed complaint with prejudice); *cf. James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1070 (9th Cir.2002) (allowing appeal of partial summary judgment after plaintiff dismissed remaining claims without prejudice with the approval of the district court).

■ Principal does not distinguish between claim and issue preclusion or explain which of the two categories it believes applies in this case. It appears that Principal's argument is best considered as a request for application of issue preclusion. Principal argues that the dismissal of Amadeo's breach of contract claim necessarily decided, adversely to Amadeo, the issue of potential for coverage of Amadeo's claim under the policy. Issue preclusion, also known as collateral estoppel, "attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (quoting Restatement (Second) of Judgments § 27 (1982)); *accord Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1031 (9th Cir.2001); *see also Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (explaining that collateral estoppel has no application when "the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue"). Principal moved for summary judgment only on the bad faith claim and the prayer for punitive damages. There was no actual litigation of any issue related to the breach of contract claim. A voluntary dismissal of a claim prior to any adjudication and without any stipulated findings of fact does not actually litigate any issue. *See Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (holding that judgment dismissing previous suit unaccompanied by findings did not bind the parties on any issue); *Pelletier v. Zweifel*, 921 F.2d 1465, 1501 (11th Cir. 1991) ("The preclusive effect of a dismissal with prejudice, an unlitigated matter, ... is examined under the requirements for claim preclusion. Since such a judgment is not accompanied by findings, it does not, however, collaterally estop the plaintiff from raising issues that might have been litigated if the case had proceeded to trial."); *Engelhardt v. Bell & Howell Co.*, 327 F.2d 30, 36 n. 1 (8th Cir.1964) (explaining that "[h]ere, as in *Lawlor*, collateral estoppel is not applicable [to the voluntary dismissal with prejudice] as the case was never tried and hence no findings of fact were made which the parties are precluded from challenging"); *cf. Arizona*, 530 U.S. at 414, 120 S.Ct. 2304(explaining that consent judgments "ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect"); Restatement (Second) of Judgments § 27 cmt. e (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."). Thus, issue preclusion cannot attach to Amadeo's voluntary dismissal of her breach of contract claim.

■ Claim preclusion, or res judicata, bars "successive litigation of the very same claim" following a final adjudication on the merits involving the same parties or their privies. *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *accord Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."); *First Pacific Bancorp v. Helfer*, 224 F.3d 1117, 1128 (9th Cir.2000); *Goddard v. Security Title Ins. & Guarantee Co.*, 14 Cal.2d 47, 92 P.2d 804, 806 (1939). The dismissal of alternative claims in a pending suit does not adjudicate the entire cause of action, *see* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4407 (1981) (explaining that cause of action refers to "all rights of the plaintiff to remedies against the defendant with re-

spect to all or any part of the transaction ... out of which the action arose") (quoting Restatement (Second) of Judgments § 24 (1981)), and therefore "[a] plaintiff who sets forth alternative remedies in separate counts in his complaint may abandon or dismiss one count without prejudice to his right to proceed on the other." *Steele v. Litton Indus.*, 260 Cal.App.2d 157, 68 Cal.Rptr. 680, 690 (1968). "The dismissal of ... alternative remedies[does] not constitute a dismissal of plaintiff's entire cause of action." *Id.* Thus, as we explained in *Concha*, when the plaintiff voluntarily dismisses claims with prejudice in order to appeal an otherwise partial judgment, "if the plaintiff is unsuccessful in challenging the district court's action, *then* the dismissal operates as an adjudication on the merits and the litigation is terminated .... The plaintiff is precluded from bringing *another action* for the same cause, thus forfeiting any possibility of ever obtaining a favorable determination on the merits." 62 F.3d at 1507–08 (emphasis added). Principal is not seeking to preclude "another action" by Amadeo, and therefore claim preclusion does not apply here.

 There are important policy reasons why a court should not apply preclusion doctrine to bar the appeal of claims after alternative claims are dismissed. Preclusion doctrine is intended to promote judicial efficiency and the finality of judgments by requiring that all related claims be brought together or forfeited (claim preclusion) and by prohibiting any party from litigating an issue that has been fully litigated previously (issue preclusion). As the Fourth Circuit explained in *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42(4th Cir.1983), those purposes are not served by applying preclusion doctrine to the dismissal of alternative claims in a single suit to facilitate an appeal. In that case, ITCO advanced alternative claims against Michelin under a North Carolina price-fixing statute and federal antitrust

legislation (Sherman Act), but dismissed the latter claim to appeal summary adjudication of the state claim. Michelin argued that the dismissal of the federal claim barred ITCO "from advancing, under the guise of the North Carolina act, what in essence is the Sherman Act claim already dismissed voluntarily." *Id.* at 50. The Fourth Circuit rejected that argument, explaining that "ITCO's decision to dismiss its Sherman Act claim appears to have been in furtherance of [preclusion] doctrine's purpose in curbing needless litigation." *Id.*

> Had ITCO *not* dismissed its federal claim and *not* sought an appeal, but, instead, taken its Sherman Act claim to trial, the prospect of wastefully duplicitous litigation would have arisen. Suppose, for instance, that the factfinder at that hypothesized trial were to reject ITCO's allegation of a price-fixing conspiracy [entitling Michelin to a judgment in its favor].... ITCO, on an ensuing appeal, would be free to challenge the correctness of the summary judgment granted Michelin on the state law claim.... A reversal, a remand, and a second trial in its entirety [could] thus be required.

*Id.* Thus, the court concluded that "[o]nly an application of res judicata in a fashion which has lost sight of that doctrine's underlying principles and purposes could prevent ITCO from pursuing its price-fixing theory on remand as a legitimate theory of liability...." *Id.* at 50. "Such an application of res judicata would defeat the very purposes the doctrine is intended to serve." *Id.* at 52.

Applying preclusion doctrine to the dismissal of one alternative claim in a single lawsuit to bar another claim in the same suit would impede judicial efficiency, forcing litigants to adjudicate claims of secondary importance to their interests only to

preserve an appeal. We agree with the Fourth Circuit that such an application of preclusion doctrine would·defeat the very purpose the doctrine is intended to serve.

Because applying either claim or issue preclusion in this case would be contrary to both the doctrinal elements and the policies of preclusion doctrine, we reject Principal's argument. The dismissal of alternative claims in a single suit does not bar the appeal of other claims in the same suit. Courts may properly exercise appellate jurisdiction under 28 U.S.C. § 1291 when a partial summary judgment is followed by a dismissal of all remaining claims, even if those claims are dismissed "with prejudice." We therefore proceed to the merits of the grant of summary judgment, which we review de novo. *Weiner v. San Diego County,* 210 F.3d 1025, 1028(9th Cir.2000).

### III. BAD FAITH CLAIM

 The covenant of good faith and fair dealing has "particular application" to insurers because they are "invested with a discretionary power affecting the rights of another," *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710, 726 (1992), and the insurance business is "affected with a public interest and offers services of a quasi-public nature," *Fletcher v. W. Nat'l Life Ins. Co.,* 10 Cal.App.3d 376, 89 Cal. Rptr. 78, 95 (1970); *see also Egan,* 169 Cal.Rptr. 691, 620 P.2d at 146 (describing the duty of insurers to "take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements") (quoting Goodman & Seaton, *Foreword: Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court,* 62 Cal. L.Rev. 309, 346–347 (1974)). *But cf. Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal. App.4th 335, 108 Cal.Rptr.2d 776, 784 (2001) (explaining that insurers are not

required to disregard the interests of their shareholders and other policyholders in evaluating claims). Reflecting the importance of insurers' good faith obligations, bad faith by an insurer is subject to tort remedies, including punitive damages. *Kransco,* 97 Cal.Rptr.2d 151, 2 P.3d at 8(explaining that "[t]he availability of tort remedies in the limited context of an *insurer's* breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position").

 "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Guebara v. Allstate Ins. Co.,* 237 F.3d 987, 992 (9th Cir.2001); *see also Gruenberg,* 108 Cal. Rptr. 480, 510 P.2d at 1037. "[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." *Chateau,* 108 Cal.Rptr.2d at 784; *accord Dalrymple v. United Servs. Auto. Ass'n,* 40 Cal.App.4th 497, 46 Cal.Rptr.2d 845, 852 (1995). Here, the district court based its grant of summary judgment on our statement that "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Lunsford v. Am. Guar. & Liab. Ins. Co.,* 18 F.3d 653, 656 (9th Cir.1994). We disagree that it was appropriate to grant summary judgment based on the "genuine issue rule" in this case.

 The genuine issue rule in the context of bad faith claims allows a district court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. *Safeco Ins. Co. of Am. v. Guyton,* 692 F.2d 551, 557 (9th Cir.1982). In such a case, because a bad faith claim can succeed only if the insurer's

conduct was unreasonable, the insurer is entitled to judgment as a matter of law. On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably. *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 985 (1978) (holding that jury appropriately found bad faith even though "some of [the] evidence was to the effect that Farmers did no more here than assert its legal position reasonably and in good faith"). In this case, there is sufficient evidence in the record from which a jury could conclude that Principal denied Amadeo's claim unreasonably and in bad faith.

In *Lunsford*, relied upon by the district court, we applied the genuine issue rule to affirm a grant of summary judgment because the insurer adopted "a reasonable construction of the policy" in the context of unsettled law and it was not disputed that the insurer conducted an adequate investigation of the claim. *Lunsford*, 18 F.3d at 656. Those conditions are not present here.

 Although summary judgment may be awarded under the genuine issue rule where the insurer reasonably construes ambiguous language in its policy, *see Guebara*, 237 F.3d at 993 (discussing cases), summary judgment is not appropriate when the insurer's interpretation of the policy is sufficiently "arbitrary or unreasonable" that a jury could conclude it was adopted in bad faith. *Franceschi v. Am. Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988); *see also Brinderson–Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 283 (9th Cir.1992). Amadeo's policy stated that she was entitled to benefits if, due to disability, she was "unable to perform the substantial and material duties of [her] regular occupation in which [she was] engaged just prior to the disability" and was "not working in any other occupation." Rather than considering Amadeo's "regular occupation" to have been her 20 year career in the securities industry, Principal insisted that if Amadeo became disabled during a period of unemployment, then the word "occupation" meant "unemployment." This is because, according to Principal's claims adjusters, the phrase "regular occupation ... just prior to the disability" meant "the activities that [the insured was] performing just immediately prior to the disability," "what they were doing right before, the day." Applying this interpretation, Principal denied Amadeo's claim because it decided that she became disabled in 1996 while unemployed and could perform the "substantial duties" of unemployment which it defined as the activities of daily living. We conclude that Principal's interpretation was sufficiently arbitrary and unreasonable that a jury could find it was adopted by Principal in bad faith.

Under California law, a reasonable interpretation of an insurance contract accords "the meaning a layperson would ordinarily attach to it," *Waller*, 44 Cal. Rptr.2d 370, 900 P.2d at 627, and construes ambiguous provisions in favor of coverage to protect the "objectively reasonable expectations of the insured." *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1264 (1990); *see Neal*, 582 P.2d at 986 n. 5 (1978) ("Good faith ... emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party[.]"). Principal's interpretation strains credulity as it does the words of the contract. In the layperson's terminology that Principal was required to apply in the context of a disability policy, the terminology "unable to perform the substantial and material duties of your regular occupation in which you were engaged just prior to the disability" would

seem to refer to Amadeo's last employment in her regular occupation as an executive in the securities industry, not her condition of being unemployed. An unemployed person is not performing "the substantial and material duties" of a "regular occupation" or "working in another occupation" by performing the daily activities of living. Nor is a person's "regular occupation" composed of whatever activities the person was performing the previous day. The phrase "regular occupation" signifies something of longer vocational duration than a day's activities.

Principal's interpretation of its contract was not within Amadeo's objectively reasonable expectations under California law. "As insurers are well aware, the major motivation for obtaining disability insurance is to provide ... peace of mind and security in the event the insured is *unable to work*." *Egan*, 169 Cal.Rptr. 691, 620 P.2d at 145 (emphasis added). Principal does not dispute that Amadeo was unable to work in 1996. It points to no decision of a court in California or elsewhere indicating that an insured's reasonable expectations under a disability income policy should be that coverage may be withheld if the individual is too disabled to work but able to perform the daily activities of living. The fact that Principal put forward this interpretation only after Dr. Gallagher expressed the initial opinion that Amadeo was "unable to work" is evidence from which a jury could conclude that the interpretation was adopted as a mere pretext for avoiding payment of the claim. *Cf. Brinderson–Newberg*, 971 F.2d at 283(holding interpretation not in bad faith where "not so unreasonable as to be a mere pretext for avoiding further investigation").

There is also sufficient evidence from which a jury could conclude that Principal's interpretation of its policy was arbitrary—"[d]epending on individual discretion ... rather than ... fixed rules, procedures, or law." Black's Law Dictionary 100 (7th ed.1999). Principal's claims adjusters testified that Principal had no guidelines for establishing when it would consider someone's regular occupation as unemployment and that the application of the policy's language in the context of an unemployed insured was "subjective." Principal points to no law supporting its position. An insurer cannot escape bad faith liability by adopting an interpretation of its policy grounded only in the subjective perceptions of its unguided claims adjusters. Arbitrary interpretation of insurance contracts is the antithesis of the reasonable dealing required by the covenant of good faith.

■■■ Even if a jury were to conclude that Principal's interpretation of the policy was not adopted in bad faith, it could find that Principal failed to conduct an adequate investigation as to whether Amadeo was due benefits under that interpretation. *See Egan*, 169 Cal.Rptr. 691, 620 P.2d at 145("[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."). Principal's denial was premised on the assumption that Amadeo became disabled in 1996 and that she could perform the substantial duties of her occupation of "unemployment." A jury could find that both of these decisions were based on an inadequate investigation of the facts surrounding Amadeo's claim.

Principal's decision that Amadeo became disabled in 1996 was based primarily on Amadeo's expression of a willingness and ability to work in an unemployment application after she left Griffin in 1994 and the start of treatment by Drs. Klemp and Lovelace in 1996. A jury could conclude that the weight of evidence available to Principal supported a contrary conclusion. *Mariscal v. Old Republic Life Ins. Co.*, 42

Cal.App.4th 1617, 50 Cal.Rptr.2d 224, 225 (1996) (explaining that an insurer acts in bad faith "[i]f it seeks to discover only the evidence that defeats the claim it holds its own interest above that of its insured"); *id.* at 227 ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim."). Dr. Gallagher reported a past history of depression or panic attacks beginning in "approximately 1990 or 1991." He also reported the existence of "a great number of stressors" that suggested Amadeo was "not able to work," the most serious of which—the history of abuse by her husband and the murder charge against Vinny—trace to 1994 or before. In addition, the record reflects that Amadeo began treatment for her depression as early as 1992 with Dr. Cassel and, according to Drs. Klemp and Lovelace, was operating under a delusion that she could return to work when she was in fact too disabled to do so. There is no evidence in the record indicating that Dr. Gallagher was ever asked for an opinion as to when Amadeo's disability began. Viewing this evidence in the light most favorable to Amadeo, a jury could find that Principal's decision that Amadeo became disabled in 1996 was reached by *ignoring* contrary evidence and failing to investigate diligently the basis of Amadeo's claim.

 In sum, we believe there is sufficient evidence from which a jury could find that Principal lacked any legitimate reason for denying Amadeo's claim. We therefore reverse the district court's award of summary judgment for Principal on the bad faith claim.[2]

## IV. PUNITIVE DAMAGES

 Because an action for bad faith sounds in tort, the general rules of tort

damages apply. *See Crisci,* 426 P.2d at 178; *Fletcher,* 89 Cal.Rptr. at 94(explaining that an insured may receive compensation "for all detriment proximately resulting [from the breach], including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages"). Punitive damages are available "if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious." *PPG Indus. v. Transamerica Ins. Co.,* 20 Cal.4th 310, 84 Cal. Rptr.2d 455, 975 P.2d 652, 658 (1999); *see also Neal,* 148 Cal.Rptr. 389, 582 P.2d at 986(explaining that to assess liability for punitive damages, "we must look further beyond the matter of reasonable response to that of motive and intent"); Cal. Civ. Code § 3294(a).

 In *Egan,* the California Supreme Court explained that "[t]he availability of punitive damages is ... compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship." 169 Cal.Rptr. 691, 620 P.2d at 146. These considerations are particularly acute in disability insurance cases where "[t]he very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity." *Fletcher,* 89 Cal.Rptr. at 95. Punitive damages are therefore made available "to

**2.** Amadeo did not cross-move for summary judgment and we therefore do not reach the question of whether she is entitled to judgment as a matter of law based on the undisputed facts in the record.

discourage the perpetuation of objectionable corporate policies" that breach the public's trust and sacrifice the interests of the vulnerable for commercial gain. *Egan,* 169 Cal.Rptr. 691, 620 P.2d at 146. Consistent with this goal, a plaintiff may meet the state of mind requirement for an award of punitive damages by showing that the insurer's bad faith was "part of a conscious course of conduct, firmly grounded in established company policy." *Neal,* 148 Cal.Rptr. 389, 582 P.2d at 987.

██ "Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." *Egan,* 169 Cal.Rptr. 691, 620 P.2d at 147. Viewed most favorably to Amadeo, there is sufficient evidence that the denial of her claim "was not simply the unfortunate result of poor judgment," *Hughes v. Blue Cross of N. Cal.,* 215 Cal.App.3d 832, 263 Cal.Rptr. 850, 858 (1989), but rather resulted from Principal's plainly unreasonable interpretation of its policy and the deliberate restriction of its investigation in a bad faith attempt to deny benefits due to Amadeo. Thus a jury might conclude that Principal's actions were willful and "rooted in established company practice." *Id.* (upholding award of punitive damages where denial of claim was "product of . . . fragmentary medical records, a cursory review of the records, . . . [a] disclaimer of any obligation to investigate, [and] the use of a standard . . . at variance with community standards"). We therefore reverse the grant of summary judgment against Amadeo on her claim for punitive damages, leaving to the jury the assessment of whether such damages are warranted.

## CONCLUSION

For these reasons, we REVERSE the district court's grant of summary adjudica-

tion against Amadeo and REMAND for further proceedings.

FERNANDEZ, Circuit Judge, Dissenting:

I dissent from the decision to overturn the district court's grant of summary judgment in favor of Principal Mutual Life Insurance on Amadeo's claims for tortious breach of the covenant of good faith and fair dealing, and for punitive damages.

After the district court granted summary judgment on the above mentioned claims, Amadeo voluntarily dismissed her claim for breach of contract with prejudice, which had the undeniable effect of determining that claim on the merits in favor of Principal. *See Commercial Space Mgmt. Co., Inc. v. The Boeing Co., Inc.,* 193 F.3d 1074, 1080 (9th Cir.1999); *Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 534 (4th Cir.1991); *Schwarz v. Folloder,* 767 F.2d 125, 129 (5th Cir.1985). That being so, Amadeo cannot claim that Principal breached the contract when it denied benefits in this case. But under California law, a breach of the obligations (expressed or implied) of the underlying contract is a sine qua non of a bad faith claim. *See Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 35–36, 900 P.2d 619, 638–39, 44 Cal.Rptr.2d 370, 389–90 (1995); *Love v. Fire Ins. Exch.,* 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246, 255 (1990); *Kopczynski v. Prudential Ins. Co.,* 164 Cal.App.3d 846, 849, 211 Cal.Rptr. 12, 14–15 (1985); *see also Solomon v. N. Am. Life & Cas. Ins. Co.,* 151 F.3d 1132, 1137 (9th Cir.1998); *State Farm Mut. Auto. Ins. Co. v. Davis,* 7 F.3d 180, 184 (9th Cir.1993). Thus, Amadeo cannot prevail on a claim for breach of the covenant of good faith, or on a claim for punitive damages.[1]

---

**1.** Because Amadeo dismissed with prejudice after the district court had ruled, it did not base its decision on that ground, but we still

can do so. *See Olson v. Morris,* 188 F.3d 1083, 1085 (9th Cir.1999); *Weiser v. United States,* 959 F.2d 146, 147 (9th Cir.1992).

In any event, it is apparent that the denial of benefits in this case was based upon a genuine dispute over whether Amadeo was legally entitled to them. She did not even apply for them until more than two years after she had stopped working. Thus, it cannot be said that Principal's refusal to pay was unreasonable. *See Lunsford v. Am. Guar. & Liab. Ins. Co.,* 18 F.3d 653, 656 (9th Cir.1994); *Franceschi v. Am. Motorists Ins. Co.,* 852 F.2d 1217, 1220 (9th Cir.1988); *Safeco Ins. Co. of Am. v. Guyton,* 692 F.2d 551, 557 (9th Cir.1982); *Opsal v. United Servs. Auto. Ass'n,* 2 Cal.App.4th 1197, 1205, 10 Cal. Rptr.2d 352 (1991). As a result, the evidence demonstrates that Principal did not breach the covenant of good faith, and cannot be liable for punitive damages. *See Lunsford,* 18 F.3d at 656; *Franceschi,* 852 F.2d at 1220; *Tibbs v. Great Am. Ins. Co.,* 755 F.2d 1370, 1375 (9th Cir.1985).

Thus, I respectfully dissent.